IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HCI DISTRIBUTION, INC. and ROCK RIVER MANUFACTURING, INC., <br><br>Plaintiffs,<br><br>vs.<br><br>DOUGLAS PETERSON, Nebraska Attorney General, and TONY FULTON, Nebraska Tax Commissioner,<br><br>Defendants. | 8:18-CV-173<br><br>MEMORANDUM AND ORDER |

The plaintiffs seek a declaration of rights pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 28 U.S.C. § 2202, regarding the enforcement of Nebraska's statutes regulating tobacco product manufacturing and distribution. The defendants are the duly elected state officers whose offices are charged with enforcement of the statutes from which the plaintiffs seek relief. The defendants jointly filed a motion to dismiss (filing 27) the plaintiffs' complaint for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). The defendants' motion will be sustained in part and denied in part.

I. STANDARD OF REVIEW

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction

bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010).

A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack'" and a "factual attack." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). A facial attack concerns a failure to allege sufficient facts to support subject matter jurisdiction, whereas a factual attack concerns the veracity of the pled facts supporting subject matter jurisdiction. *See Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018). In a facial attack, the Court merely needs to look and see if the plaintiffs have sufficiently alleged a basis of subject matter jurisdiction and accepts all factual allegations in the pleadings as true and views them in the light most favorable to the nonmoving party. *Branson Label,* 793 F.3d at 914. Here, the defendants are advancing a "facial attack" to subject matter jurisdiction, based on the pleadings. *See id.* Accordingly, the Court restricts itself to the pleadings and the plaintiffs receive the same protections as they do under Rule 12(b)(6). *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For the purposes of a motion to dismiss a court must take all the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## II. BACKGROUND

The plaintiffs, HCI Distribution, Inc., and Rock River Manufacturing, Inc., are wholly owned subsidiaries of Ho-Chunk, Inc. Filing 1 at 6. Ho-Chunk

is the economic development arm of the Winnebago Tribe. Both HCI and Rock River are incorporated under Tribal law. The Tribe is a federally recognized Indian tribe eligible to receive services from the United States Bureau of Indian Affairs with its reservation land sited within the boundaries of Nebraska. Filing 1 at 6; *see* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 83 Fed. Reg. 4,235 (Jan 30, 2018).

HCI's business consists of purchasing and reselling tobacco goods exclusively in Indian country throughout the United States. Filing 1 at 7. HCI sells to reservation-based wholesalers and retailers exclusively in Indian country. All tobacco products HCI ships are affixed with tax stamps in accordance with Tribal law. HCI employs tribal members and allocates 20 percent of its net profits to support tribal welfare programs, which in 2017 allowed HCI to contribute $157,381 to the tribe.

Rock River is a federally licensed cigarette manufacturer with its facilities on the Tribe's reservation. Filing 1 at 8. All Rock River's products are manufactured on the reservation. Rock River's products are distributed by HCI and other distributors, and are sold by such distributors to retailers nationwide. All Rock River's tobacco products bear the tribal stamp for each jurisdiction where its products are sold.

In 1998, Nebraska and 45 other states settled lawsuits with several tobacco manufacturers and trade organizations. The parties' Master Settlement Agreement (MSA) required the tobacco manufacturers to place restrictions on tobacco product advertising and marketing, as well as make cash payments in perpetuity to the settling states. Filing 1 at 2; *see also Omaha Tribe of Nebraska v. Miller*, 311 F. Supp. 2d 816, 818 (S.D. Iowa 2004). Later, additional tobacco manufacturers signed onto the MSA. These subsequent

participating manufacturers, together with the original participating manufacturers are referred to collectively as the participating manufacturers. Filing 1 at 2.

Not all tobacco manufacturers signed onto the MSA. Those that did not are called non-participating manufacturers. Rock River is one such non-participating manufacturer. Filing 1 at 8. The settling states became concerned that the non-participating manufacturers could avoid liability for the harm that their tobacco products could cause, and the participating manufacturers were concerned that the non-participating manufacturers would be able to unfairly compete in the market without incurring costs similar to the costs associated with participation in the MSA. *Miller*, 311 F. Supp. 2d at 818; filing 1 at 3. In response, the participating manufacturers and the settling states agreed to enact variations of a model statutory scheme that imposed fees and other regulations on non-participating manufacturers. Filing 1 at 3. Those statutes are often referred to as qualifying or escrow statutes. Filing 1 at 9.

Nebraska enacted its version of an escrow statute in 1999. Neb. Rev. Stat. §§ 69-2701 to 69-2703.01. Section 69-2703 essentially provided that tobacco manufacturers selling cigarettes within the state could either join the MSA as a participating manufacturer or be required to fund an escrow account by placing funds into an account on a quarterly basis regarding the manufacturer's unit sales of tobacco products. Violation of the escrow requirements could result in civil penalties and possible exclusion from selling tobacco products in the state.

The terms of the MSA required the settling states to diligently enforce their escrow statute. Filing 1 at 9-10. When enforcement proved difficult, the states enacted further model legislation referred to as the directory statute. The purpose of this legislation was to publish a list of tobacco product

4

manufacturers and tobacco products that were in full compliance with the escrow statute and other tobacco manufacturing and licensing laws. Filing 1 at 10. Tobacco products not on the directory list could not be sold in the state. Nebraska's directory statute, enacted in 2003, is found at §§ 69-2704 to 69-2707.01. Together, the escrow and directory statutes are often referred to as the MSA laws.

Still claiming that the settling states were not diligently enforcing the escrow requirements, the participating manufacturers initiated an arbitration proceeding to reduce the payments owed to the settling states. Filing 1 at 12. Of particular concern were tobacco producer sales in Indian country. Filing 1 at 13. Some of the settling states, including Nebraska, were pressured into including new statutory provisions aimed at the tribal tobacco business. Filing 1 at 12; *see also* filing 1-5.

The plaintiffs and the Tribe have always maintained that their sovereign authority precluded the state's authority to regulate their on-reservation tobacco manufacturing and tobacco distribution business. Filing 1 at 11. In 2011, the Nebraska Attorney General's office worked with representatives of the tobacco manufacturers to devise model legislation aimed at regulating tribal tobacco manufacturing and distribution, and require tribes to comply with Nebraska's MSA laws. Filing 1-1. That same year, legislation was enacted that purportedly brought tribal tobacco product manufacturing and distribution within the regulations imposed by the escrow statute, but also purported to provide a release of funds for "cigarettes sold on an Indian tribe's Indian country to its tribal members"—but only if there was an agreement with the Governor, in which a tribe was required to accept state regulation of the tribe's cigarette manufacturing and distribution business. *See* §§ 69-2703(2)(b)(iv) and 77-2602.06.

5

In December 2015, the Tribe, and the plaintiffs in April 2016, entered into an agreement of their own separate from their negotiations with the State. This agreement is called the "Universal Tobacco Settlement Agreement." The agreement purported to regulate cigarette sales in Indian country, as well as create a fund that would allow the tobacco product manufacturers participating in this new agreement to obtain a release of all claims that may arise out of the sale of their products. Filing 1 at 11-12; filing 1-2. In addition to regulating cigarette marketing, the agreement required the participating tobacco product manufacturers to make quarterly payments to a settling tribe regarding the number of cigarettes sold in that tribe's jurisdiction. Filing 1-2 at 6-7. In 2017, the Tribe received fees pursuant to the agreement totaling $31,681.00. Filing 1 at 11-12. In addition, the Tribe imposes a tax on the sale of cigarettes within its jurisdiction. In 2017 the Tribe collected $122,658 in cigarette tax revenue. Id.

In 2014, at approximately the same time the Tribe was considering participation in the Universal Tobacco Settlement Agreement, the Nebraska Department of Revenue issued tax statements to several reservation-based cigarette retailers. Filing 1 at 14. According to the plaintiffs, the issuance of tax statements prompted them to engage in negotiations with the defendants to settle their disagreement regarding whether their tobacco manufacturing and distribution business was subject to Nebraska's MSA laws. The plaintiffs contend that the negotiations were unsuccessful due to the defendants' insistence that the plaintiffs were not excused from strict compliance with Nebraska's MSA laws. The plaintiffs represent that since March 2014, they have operated under a cloud of uncertainty regarding the threat of penalties and retaliation by the defendants, which has created an impediment to their business operations and ability to expand economically. Filing 1 at 15.

## III. DISCUSSION
### 1. SUBJECT-MATTER JURISDICTION

The plaintiffs rely on 28 U.S.C. § 1362 and § 1331 for subject matter jurisdiction. Section 1362 specifically pertains to Indian tribes and gives the district courts "original jurisdiction of all civil actions brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." Similarly, § 1331 pertains to all civil actions and gives district courts original jurisdiction for "actions arising under the Constitution, laws, or treaties of the United States."

There is no dispute that the plaintiffs' claims constitute a civil action arising under the Constitution. The plaintiffs alleged that the defendants' regulatory scheme violates both the Supremacy Clause (art. VI, cl. 2) and the Indian Commerce Clause (art. 1 § 8, cl. 3) of the Constitution. As such, subject matter jurisdiction pursuant to § 1331 was sufficiently pled.[1]

The Court finds that at a minimum, there is subject matter jurisdiction pursuant to § 1331. Accordingly, the Court will deny the defendants' motion to

---

[1] Regarding § 1362 subject matter jurisdiction, the defendants argue that the plaintiffs are not "an Indian tribe or band" within the meaning of § 1362. Filing 28 at 44. However, the defendants do not dispute that the plaintiffs are tribal businesses and that the Tribe is federally recognized. So, the defendants' assertion that the plaintiffs are not an Indian band or tribe is contrary to the pled facts. The plaintiffs alleged that they are incorporated under Tribal law, are wholly owned by Ho-Chunk, and that Ho-Chunk is the economic development arm of the Tribe. To argue that the economic arm of the Tribe is not part of the Tribe is like arguing that the defendants, as the law enforcement arms of the State, are not the State. *See United Keetoowah Band of Cherokee Indians v. State of Okla. ex rel. Moss*, 927 F.2d 1170, 1173 (10th Cir. 1991).

dismiss pursuant to Rule 12(b)(1) regarding a lack of subject matter jurisdiction.

## 2. STANDING AND RIPENESS.

Standing is essential regarding the Article III requirement of case or controversy. *McDaniel v. Precythe*, 897 F.3d 946, 950 (8th Cir. 2018). "To demonstrate Article III standing, a plaintiff 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

The plaintiffs allege that the defendants threaten to enforce the escrow and directory statutes against the plaintiffs, which the plaintiffs argue represent an unconstitutional—and therefore unlawful—interference with their tribal sovereignty. And, violation of the escrow and directory statutes would subject the plaintiffs to civil penalties. Pre-enforcement challenges to governmental action may constitute an injury in fact sufficient for Article III standing. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) ("[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The plaintiffs sufficiently alleged facts showing a credible threat that the defendants will seek to enforce the escrow and directory statutes if not enjoined from so doing. The plaintiffs alleged that issuance of tax assessments to reservation-based cigarette retailers prompted the plaintiffs to engage in settlement discussions with the defendants, but that the discussions were

unsuccessful due to the defendants' insistence that the plaintiffs were not excused from strict compliance with Nebraska's MSA laws. Filing 1 at 14.

Finally, "when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained of provision." *Dig. Recognition Network v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015); *see also Calzone v. Hawley*, 866 F.3d 866, 869 (2017). The defendants are the elected officials whose offices are charged with enforcing the escrow and directory statutes. Moreover, a decision by this Court that the statutes violate the plaintiffs' constitutional rights would certainly favorably redress the plaintiffs' claims. The Court finds that the plaintiffs have Article III standing in this matter.

As a matter of completeness, the defendants' ripeness argument concerns what is referred to as the "term sheet." The Court understands the allegations in the plaintiffs' complaint regarding the term sheet to be that it is evidence that Indian tribes were targets of the revisions to the MSA laws. The term sheet does not present a claim or cause of action in and of itself. *See* filing 1 at 13-14, 17; *see also* filing 29 at 20 n.12.

### 3. Eleventh Amendment Sovereign Immunity.

The defendants, two state officials, assert that they are immune from suit under the Eleventh Amendment. Filing 28 at 11-12. The Eleventh Amendment bars suits brought by private individuals against a State. *McDaniel*, 897 F.3d at 951 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997)). "Under the exception established in *Ex parte Young*, however, a private party may sue state officials in their official capacities for prospective injunctive relief." *McDaniel*, 897 F.3d at 951-52 (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). In assessing

9

application of the doctrine in *Ex parte Young*, a court should conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.*

The plaintiffs' complaint does not specifically identify whether the defendants are sued in their official or individual capacity. However, the general rule is a complaint that is silent regarding the capacity in which the defendant is sued is interpreted as including only official-capacity claims. *Baker v. Chisom*, 501 F.3d 920, 923 (8th Cir. 2007). "If the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity." *Id.*

Even without application of the general rule, it is clear the plaintiffs intended to sue the defendants in their official capacity. In the section of the plaintiffs' complaint where the parties are identified, defendant Peterson was not identified as an individual but identified as the Nebraska Attorney General. Filing 1 at 6. Defendant Fulton was also not identified as an individual but identified as the Nebraska Tax Commissioner. *Id.* Both defendants are alleged to be "charged with enforcing Nebraska's MSA laws." Filing 1 at 6. Importantly, the plaintiffs only seek prospective injunctive relief from the defendants' enforcement of Nebraska's MSA laws.

The plaintiffs' claims fit the analysis required for application of the *Ex parte Young* doctrine. The plaintiffs pray to enjoin the defendants from enforcing state laws that interfere with the Tribe's constitutionally protected sovereignty. "The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our 'straightforward inquiry.'" *Verizon Md. Inc.*, 535 U.S. at 645. The

Court finds that the defendants are not shielded by Eleventh Amendment immunity.

4. SUPREMACY CLAUSE AND INDIAN COMMERCE CLAUSE.

Although the plaintiffs' complaint references separate Supremacy Clause and Indian Commerce Clause causes of action, the claims as pled bootstrap each other. Essentially, the plaintiffs allege that the defendants' regulatory scheme violates the Supremacy Clause because the scheme violates the Indian Commerce Clause. Filing 1 at 15-16. Thus, analysis of the defendant's motion to dismiss the plaintiffs' Indian Commerce Clause claims will resolve both constitutional claims.

Pursuant to the Indian Commerce Clause,[2] Congress has broad powers to regulate tribal affairs.

> This congressional authority and the semi-independent position of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them.

*White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (quotations omitted). The parties appear to agree, as does the Court, that Congress has not enacted comprehensive cigarette manufacturing and distribution legislation

---

[2] "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes." U.S. Const. art 1, § 8, cl. 3.

11

that would preempt state regulations. Thus, the issue is whether the state regulatory scheme in this matter constitutes an unlawful infringement on the right of the tribe to make and be ruled by its own laws.

In considering whether a state enactment represents an unlawful infringement of a tribe's sovereignty, a distinction is drawn between state regulation of tribal activities and taxation of a tribe or tribe member. *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458 (1995). Additionally, when the challenge involves a tax, "the 'who' and the 'where' of the challenged tax have significant consequences." *Wagon v. Prairie Band Potawatomi Nation,* 546 U.S. 95, 101 (2005).

When the issue is state regulation of tribal affairs, a balance of federal, state and tribal interests is engaged. "Under certain circumstances a State may validly assert authority over the activities of non-members on a reservation, and in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 215 (1987) (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331-32 (1983)). States generally have the authority to require tribes to collect lawful taxes, such as sales taxes, from non-tribal members' activities on tribal lands. *See Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 483 (1976); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 150-51 (1980); *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.,* 512 U.S. 61, 68 (1994). In these situations, the legal incidence of the tax is on the consumer to pay the sales tax, and the tribal business is merely collecting the tax for the state. States may also impose a regulatory burden on a tribe to keep extensive records of cigarette sales, as a state has a valid interest in ensuring compliance

with lawful taxes that might otherwise be evaded. *Milhelm Attea,* 512 U.S. at 62.

Regarding regulations pertaining to tribal members on the reservation, "[w]hen on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker,* 448 U.S. at 144. However, "when Indians ('who') act outside of their own Indian country ('where'), including within the Indian country of another tribe, they are subject to non-discriminatory state laws otherwise applicable to all citizens of the state." *Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1172 (10th Cir. 2012).

State taxation levied on a tribe or tribe member on the tribe's reservation is more categorical. "[A] State is without power to tax reservation lands and reservation Indians. Taking this categorical approach, we have held unenforceable a number of state taxes whose legal incidence rested on a tribe or on tribal members inside Indian country." *Chickasaw Nation,* 515 U.S. at 458 (citation omitted).

> If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization. But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy[.]

*Id.* at 459 (citation omitted).

On a motion to dismiss pursuant to Rule 12(b)(6), the non-moving party is entitled to all inferences in fact and law. *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012). With the requisite standard of review in mind, the Court finds that the escrow requirement found in § 69-2703 *could be* viewed as imposing a tax. The Court acknowledges that both parties argue the MSA laws, and specifically the escrow requirement, is not a tax. But, the Court concludes, that determination can only be made upon a full and complete evidentiary record. As this matter currently stands, on the plaintiffs' complaint alone, the Court finds that the escrow requirement *could be* viewed as a tax, the legal incidence of which rests, at least in part, on the plaintiffs in tribal territory and therefore cannot be enforced absent clear congressional authorization. *See Chickasaw Nation*, 515 U.S. at 458. Moreover, to the extent that the legal incidence of the tax is on a non-Indian or non-tribal member, "the tax may nonetheless be pre-empted if the transaction giving rise to tax liability occurs on the reservation and the imposition of the tax fails the [*Bracker* interest-balancing test]." *Prairie Band Potawatomi Nation*, 546 U.S. at 102.

"A 'tax' is an enforced contribution to provide for the support of government." *United States v. La Franca*, 282 U.S. 568, 572 (1931). "[A]n involuntary exaction, levied for a governmental or public purpose, can be held to be nothing other than a tax within the purview of the Federal bankruptcy act." *Michigan Emp't Sec. Comm'n v. Patt*, 144 N.W.2d 663, 665 (Mich. Ct. App. 1966) (contributions to a fund required by Employment Security Act deemed a tax). "[A] shared responsibility payment may for constitutional purposes be considered a tax, not a penalty." *Nat. Fed'n. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 566 (2012) (concluding that the Affordable Care Act's individual mandate was a tax).

14

Arguably, the escrow statute requires non-participating manufacturers to make a "shared responsibility payment" into a qualified escrow fund. "Any tobacco product manufacturer selling cigarettes to consumers within the state" are required to become a participating member of the MSA or "[p]lace into a qualified escrow fund on a quarterly basis" a statutorily mandated monetary contribution based on the number of cigarette "units sold." §§ 69-2703(1) & (2)(a). The purpose for the qualified escrow fund is "[t]o pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the state or any releasing party located or residing in the state." § 69-2703(2)(b)(i).

Not only may the escrowed funds inure to the benefit of the state or residents of the state, but the non-participating manufacturer is denied access to the escrowed funds' principal,[3] with certain limited exceptions.

> Qualified escrow fund means an escrow arrangement with a federally or state-chartered financial institution . . . where such arrangement requires that such financial institution hold the escrowed funds' principal for the benefit of releasing parties and prohibits the tobacco product manufacturer that places such funds into escrow from using, accessing, or directing the use of the funds' principal.

§ 69-2702(10).

---

[3] Funds are released to satisfy judgments or settlements "in the order in which they were placed into escrow." § 69-2703(2)(b)(i). After a quarterly contribution has been in escrow for 25 years, if not released due to satisfaction of a judgment or settlement, that quarterly contribution will revert-back to the tobacco product manufacturer. § 69-2703(2)(b)(iii).

15

One of the limited exceptions allowing access to an escrow funds' principal concerns Indian tribes. A tribe "may seek release of escrow deposited pursuant to this section on cigarettes sold on an Indian tribe's Indian country to its tribal members." § 69-2703(2)(b)(iv). However, the release is conditioned on the existence of an agreement with the state in which the tribe agrees to significant state regulatory control and a limited waiver of the tribe's sovereign immunity. *See* § 77-2602.06.

Moreover, the directory statute incorporates the taxation features of the escrow statute by requiring "[e]very tobacco product manufacturer whose cigarettes are sold in this state" and who is a non-participating manufacturer to certify that it has "established and continues to maintain a qualified escrow fund that has been reviewed and approved by the Attorney General." And, each such non-participating manufacturer must certify it "is in full compliance" with the requisite quarterly contributions to its qualified escrow fund. § 69-2706(1)(d)(iii).

It is true that the MSA laws on the whole are regulatory. Indeed, the directory statute incorporates participation in the escrow statutory scheme by reference, but otherwise, on its own, does not impose payment into a fund available for the state to use as it sees fit. But that does not exclude the possibility that the escrow provision effects a tax on the tribal tobacco products manufacturers. "'Every tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed.'" *Nat. Fed'n. of Indep. Business*, 567 U.S. at 567.

Again, both parties argue that the MSA laws do not impose a tax. But even if the MSA laws better fit the paradigm of a regulatory scheme, the laws would be subject to review pursuant to the *Bracker* interest-balancing test. *See Cabazon Band of Mission Indians*, 480 U.S. at 215. Thus, whether framed as

16

taxation or as regulatory, the facts alleged in the complaint would allow the Court to conclude that Nebraska's MSA laws infringe on "the right of reservation Indians to make their own laws and be ruled by them." *Bracker, 448 U.S. at 142*. What is clear is that the plaintiffs' Indian Commerce Clause claims may not be resolved on a summary basis. Resolution of the issues concerning Indian country and tribal member taxation and regulation are exceedingly complex and context-dependent. The Court cannot determine whether the MSA laws impose a tax or regulation, or both, or the extent to which the tax or regulations interfere with a tribe's right to make and be ruled by its own laws, on the plaintiffs' complaint standing alone. The Court anticipates that a full evidentiary record will be required before it may undertake a complete resolution of the parties' claims and contentions pursuant to the Indian Commerce Clause. Accordingly, the Court finds that the plaintiffs have alleged a plausible factual basis to give rise to a claim pursuant to the Indian Commerce Clause.

### 5. EQUAL PROTECTION

Plaintiffs allege that the "State of Nebraska" has "targeted Indian tribes and reservation Indians for increased scrutiny and increased legal burdens under its MSA laws." Filing 1 at 17. The Equal Protection Clause generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.* 473 U.S. 432, 439 (1985). Accordingly, the first step in an equal protection analysis in this matter is determining whether the plaintiffs have alleged facts showing they are treated differently than other tobacco product manufacturers. *See Klinger v. Dept. of Corrections*, 31 F.3d 727, 731 (8th Cir. 1994).

The plaintiffs allege that Indian tribal sovereignty requires that they must be treated differently from all other tobacco product manufacturers. As

such, the plaintiffs' claim is the exact opposite of an equal protection claim. The plaintiffs claim that the Indian Commerce Clause and Indian tribal sovereign immunity require their disparate treatment from all other tobacco product manufacturers, and that they are entitled to have this disparate treatment continue.

Although dissimilar to the model MSA statutes enacted by other states, Nebraska's MSA laws—in the same manner as other State's MSA laws—seeks to treat all tobacco product manufacturers alike, yet give some degree of deference to an Indian tribe's tobacco product manufacturing business. The deference is due to an Indian tribe's sovereignty. Because the plaintiffs' complaint seeks to achieve greater disparate treatment from other tobacco product manufacturers by enjoining the application of Nebraska's MSA laws with respect to its tobacco product manufacturing, the Court finds that plaintiffs failed to allege an equal protection violation. That claim will be dismissed.

IT IS ORDERED:

1. The defendants' motion to dismiss (filing 27) is granted in part and in part denied.

2. The plaintiffs' equal protection claim is dismissed.

3. This matter is referred to the Magistrate Judge for case progression.

Dated this 19th day of December, 2018.

BY THE COURT:

_John M. Gerrard_
John M. Gerrard
Chief United States District Judge