IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HCI DISTRIBUTION, INC. and ROCK RIVER MANUFACTURING, INC., | |
| Plaintiffs, | 8:18-CV-173 |
| vs. | |
| MIKE HILGERS, Nebraska Attorney General, and GLEN A. WHITE, Interim Nebraska Tax Commissioner,[1] | MEMORANDUM AND ORDER |
| Defendants. | |

This case is about the constitutionality of some of the State of Nebraska's tobacco-related statutes as applied to the plaintiffs. The plaintiffs are wholly owned subsidiaries of an economic development company entirely controlled by a federally recognized Native American tribe, and they seek a declaration of rights pursuant to 28 U.S.C. § 2201 and injunctive relief pursuant to 28 U.S.C. § 2202. The defendants are the duly elected state officers whose offices are charged with enforcement of the statutes from which the plaintiffs seek relief.

This matter comes before the Court on the parties' cross-motions for summary judgment. Filing 123; filing 129. Both motions will be granted in part and denied in part. For tobacco products sold on the Winnebago Reservation, the Court will grant the relief sought by the plaintiffs. But, for tobacco products

---

[1] Mike Hilgers, Nebraska Attorney General, and Glen A. White, Interim Tax Commissioner, are substituted for Doug Peterson and Tony Fulton as defendants in this action, pursuant to Fed. R. Civ. P. 25(d)(1).

sold anywhere else in Nebraska, including on the Omaha Reservation, the State may enforce its tobacco regulations.

## I. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. BACKGROUND

The issue in this case is whether the State of Nebraska can enforce certain tobacco product regulations against the plaintiffs. The plaintiffs, HCI Distribution, Inc. (HCID) and Rock River Manufacturing, Inc., are wholly owned subsidiaries of Ho-Chunk, Inc. Filing 130 at 2, 6. Ho-Chunk is a tribal company, meaning it is incorporated under the laws of and is wholly owned by the Winnebago Tribe of Nebraska, a federally recognized Native American tribe. Filing 124 at 10; filing 125-1 at 12; *see also* 25 U.S.C. § 5123; Restatement of the Law of American Indians § 50(d) (Am. L. Inst. 2022); Winnebago Tribal Code § 11B-108 (filing 125-3 at 131). Rock River manufactures and imports tobacco products, mostly cigarettes, and HCID purchases Rock River's products and distributes them to retailers on the Winnebago Reservation, other Native American reservations in Nebraska, and in other states. Filing 130 at 2, 9; filing 124 at 14-15, 17.

### STATUTORY FRAMEWORK

Specifically, the parties disagree about whether the plaintiffs are required to pay deposits into a qualified escrow fund pursuant to Neb. Rev. Stat. § 69-2703 and post a bond securing such payments under Neb. Rev. Stat. § 69-2707.01 for tobacco products sold in Indian country, as defined by Neb. Rev. Stat. § 69-2702.[2] The State promulgated these regulations as part of its obligations under a 1998 settlement agreement. In this Master Settlement Agreement (MSA), Nebraska and 45 other states agreed to release some tobacco product manufacturers from past and future claims involving consumer protection, advertising, and adverse health effects of cigarettes, and

---

[2] The state's definition of Indian country is identical to the federal definition, 18 U.S.C. § 1151.

the tobacco product manufacturers agreed to restrict the types of advertisements they used, and agreed to make annual settlement payments to the states in perpetuity. Nebraska relies on the MSA payments to support critical state services, such as the Health Care Cash Fund, which provides $60 million per year for state services like biomedical research, children's health insurance, tobacco prevention and control, and more. Filing 130 at 21.

As part of the MSA, the participating manufacturers were concerned about losing their share of the market because the perpetual settlement payments would increase their costs and would thus increase the price of cigarettes, and non-participating manufacturers would not incur these costs. The settling states agreed to enact model legislation intended to negate any competitive advantage earned by manufacturers who chose not to participate in the MSA. *See Omaha Tribe of Nebraska v. Miller*, 311 F.Supp.2d 816, 817 (2004); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d. 158, 163 (2d Cir. 2005). Nebraska law requires manufacturers to either, (1) join the MSA as participating manufacturers and make the required settlement payments, or (2) agree to make deposits into an escrow account based on the number of tobacco product sales within the state. Neb. Rev. Stat. § 69-2703. The amount of the escrow deposit per cigarette is intended to match the cost of the MSA settlement payments. *See* § 69-2703(b)(ii). Additional legislation was later enacted by the settling states, including Nebraska, to aid in enforcing the escrow payments. § 69-2704; *see Pryor*, 425 F.3d at 164.

Before selling cigarettes in Nebraska, tobacco product manufacturers must be listed in the Directory of Certified Tobacco Product Manufacturers and Brands. § 69-2706; *see also* http://bit.ly/3H9HXD8. To be listed in the directory, non-participating tobacco product manufacturers must certify their compliance with the escrow statutes. §§ 67-2706(1)(a) and 69-2703. The non-

participating manufacturer must also post a bond "for the benefit of the state" of at least $100,000. § 69-2701.01. The escrow ensures that the State can collect judgment or settlement money for claims from which the participating manufacturers were released. And the bond further ensures such collection in the event the manufacturer does not make proper escrow payments.

The non-participating manufacturer is entitled to interest on the escrow, and the funds will revert back to the manufacturer after 25 years. The escrow funds may be released if the State secures a judgment or settlement against the manufacturer for claims related to: "(A) the use, sale, distribution, manufacture, development, advertising, marketing, or health effects of, (B) the exposure to, or (C) research, statements, or warnings regarding" tobacco products "manufactured in the ordinary course of business." §§ 69-2703(2)(b)(i), 69-2702(11); Master Settlement Agreement part II, cl. nn. Escrow payments may also be released if the escrow deposit amount exceeds the amount paid by participating manufacturers pursuant to the MSA.

The statute also contemplates releasing escrow deposits for "cigarettes sold on an Indian tribe's Indian country to its tribal members," but only if a tribe enters into an agreement with the State. Neb. Rev. Stat. § 69-2703(2)(b)(iv). As part of the agreement, both a tribe and the State waive sovereign immunity objections with respect to the agreement, divide the proceeds of the tax and escrow, and  provide for reporting and auditing requirements and "other necessary and proper matters." § 77-2602.06. The plaintiffs attempted to negotiate such an agreement, but ultimately, those negotiations failed, in part because the parties could not agree on the scope of the waiver of sovereign immunity. Filing 124 at 23; filing 125-1 at 29-30.

- 5 -

THE PLAINTIFFS

Now, the plaintiffs argue that their status as subsidiaries of the Winnebago Tribe prevents State enforcement of the escrow laws. The Tribe is organized under Section 16 of the Indian Reorganization Act. *See* filing 125-1 at 12; 25 U.S.C. § 5123. Under this Act, the Tribe created its constitution and laws to be governed by, including a Business Corporation Code. The Tribe has the power to form wholly owned tribal companies, and it founded Ho-Chunk under its tribal code in 1994. Filing 124 at 10; Winnebago Tribal Code § 11B-108 (filing 125-3 at 131). The mission of Ho-Chunk is to create economic development and jobs for tribal members, and to "generate a sustainable, long-term income stream large enough for the Tribe to reach economic self-sufficiency." Filing 125-3 at 217.

Ho-Chunk's business model optimizes legal and economic benefits from the Tribe's unique sovereign status and from federal government programs like the 8(a) Business Development Program, 15 U.S.C. § 637(a). *See id.;* filing 125-3 at 209. Ho-Chunk's ventures include manufacturing and selling tobacco products, government contracting, construction, owning and operating convenience stores, selling used cars, leasing storage units, managing real estate, and retailing traditional Native American products such as foods, gifts, and health and beauty products. To operate in all these industries, Ho-Chunk created several wholly owned subsidiaries pursuant to various Winnebago Tribal Code provisions. Filing 124 at 10-11. These wholly owned subsidiaries include the plaintiffs, as well as All Native, Inc., Ho-Chunk Capital Company, Pony Express convenience stores, Ho-Chunk Farms, Sweet Grass Trading Company, Titan Motors, Titan Storage, WarHorse Gaming, LLC, and more. *See* filing 125-3 at 230-35.

From its net revenue, combined from all its subsidiaries, Ho-Chunk pays the Tribe an annual 25 percent dividend. Filing 125-3 at 212. Ho-Chunk also donates to tribal community programs, such as educational scholarships and the Down Payment Assistance Program, which provides financial support to tribal members purchasing homes on the Winnebago Reservation, in Winnebago, Nebraska, in a planned community which Ho-Chunk helped develop. Filing 125-3 at 220-21. In 2018, Ho-Chunk's payments to the Tribe through dividends and donations totaled $181,900,000. Filing 125-3 at 222. Ho-Chunk provides jobs and wages to tribal members and contributes tax dollars to the Winnebago tribal government. *Id*.

Rock River is a federally licensed cigarette manufacturer and it complies with federal tobacco regulations. Filing 124 at 16; filing 130 at 13, 50. Rock River currently manufactures all its own cigarettes in its facility on the Reservation. Filing 130 at 3; filing 131-3 at 10; filing 124 at 16; filing 127. Rock River purchases a tobacco blend from a company called AllianceOne, which is not located in Nebraska and not affiliated with the Winnebago Tribe. Filing 130 at 9. Rock River also is a federally licensed importer of cigarettes manufactured by other companies. Filing 130 at 2. Rock River has operated at a loss since 2016, and lost $804,401 in 2021. Filing 124 at 17. For sales of cigarettes in states other than Nebraska, Rock River complies with escrow and directory statutes. Filing 130 at 16; filing 149 at 16. Since 2014, Rock River has employed fifteen people, nine of whom were members of the Winnebago Tribe. Filing 130 at 4.

HCID is a tobacco distributor which purchases tobacco products from Rock River and sells them to customers for retail sales. Filing 124 at 14; filing 130 at 6. In Nebraska, HCID sells cigarettes to casinos run by the Tribe and to convenience stores owned by another Ho-Chunk subsidiary, Ho-Chunk

Winnebago, Inc. Ho-Chunk Winnebago owns Pony Express and other convenience stores on the Winnebago Reservation and on the neighboring Omaha Reservation. Filing 124 at 14, 18. HCID also sells cigarettes to customers outside of Nebraska, and to retailers which are unaffiliated with the Tribe. Filing 124 at 14. In 2021, HCID reported that it sold 1,852,800 cigarettes to retail locations on the Omaha Reservation, and from January through August 2022, it reported 4,709,800 cigarettes sold on the Winnebago Reservation. Filing 130 at 18.

A pack of cigarettes contains 20 cigarettes, and a carton contains 200 cigarettes. Filing 130 at 9. Rock River spends approximately $3.7654 per carton of cigarettes for materials to manufacture cigarettes, including the tobacco, packaging materials, glue, papers, and all other raw materials. Filing 124 at 17. Rock River spends approximately $1.6161 per carton for labor, overhead, and utilities. Filing 124 at 18. Federal and freight taxes cost Rock River approximately $10.86235 per carton. *Id*. Rock River sells Silver Cloud cigarettes to HCID for $17.35 per carton, and a typical sale of Silver Cloud cigarettes from HCID to Pony Express stores is $20.64 per carton. Filing 149 at 9. The cost of a carton does not include the value of the cigarette escrow or state excise tax. Filing 130 at 13. If required to pay escrow deposits, the price of cigarettes from Rock River to HCID, and from HCID to its retailers, would increase.

The Tribe taxes and regulates tobacco products sold and manufactured on the Winnebago Reservation. And the Tribe has its own settlement agreement, the Universal Tobacco Settlement Agreement, entered into by the plaintiffs in April 2016. Filing 125-3 at 167-79. Under the agreement, the plaintiffs are prohibited from certain marketing practices, such as using advertising tailored to minors, and they must pay a certain amount to the Tribe

for each cigarette sold. The Tribe released the plaintiffs for past and future claims arising out of the use, sale, distribution, manufacture, development, advertising, marketing, health effects or the exposure to cigarettes, which parallels the released claims in the MSA. Filing 125-3 at 171.

## III. DISCUSSION

As described in this Court's earlier Order, under the Indian Commerce Clause of the Constitution, U.S. Const. art 1, § 8, cl. 3, the State cannot require the Tribe to comply with the tobacco regulations if such regulations are preempted by federal law or if they constitute an unlawful infringement on the right of the Tribe to make and be ruled by its own laws. Filing 35 at 11-12; White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980); Williams v. Lee, 358 U.S. 217, 220 (1959); see also Conference of Western Attorneys General, American Indian Law Deskbook §§ 5:17, 5:20 (2016).

While the field of Indian law is fraught with exemptions, exceptions, and unique legal frameworks which evade sweeping generalizations, the Supreme Court has laid out foundational principles to follow in determining the limits of a state's power in Indian country. See, e.g., Bracker, 448 U.S. at 141. To begin, a state is categorically barred from taxing "reservation lands and reservation Indians." Okla. Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458 (1995); filing 35 at 12. Evaluating the scope of state regulation over both member and non-member conduct in Indian country is subject to the analysis described in Bracker, 448 U.S. at 141.

Only in "exceptional circumstances" may a state "assert jurisdiction over the on-reservation activities of tribal members." California v. Cabazon Band of Mission Indians, 480 U.S. 202, 215 (1987), superseded by statute, Indian Gaming Regulatory Act, Pub. L. 100-497, 102 Stat. 2467 (quoting New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 331-32 (1983)); see also Bracker, 448

U.S. at 141 ("When on-on reservation conduct involving only Indians is at issue, state law is generally inapplicable"); Restatement of the Law of American Indians §§ 31, 49; Cohen's Handbook of Federal Indian Law §§ 6.01, 6.03 (2012 ed.); American Indian Law Deskbook § 5:20. But, a state may, in some circumstances, impose "minimal burdens" on a tribally-run business on a reservation in order to enforce valid state laws. For example, a state can require a tribe to collect and record valid cigarette excise taxes imposed on non-members. *Moe v. Confederated Salish and Kootenai Tribes of Flathead Rsrv.*, 425 U.S. 463, 480 (1976); *Washington v. Confederated Tribes of the Colville Indian Rsrv.*, 447 U.S. 134, 159-60 (1980).

This is the complicated (and somewhat contradictory) legal morass in which the State's attempted regulation of the plaintiffs' tobacco sales is situated. So, the escrow laws are categorically preempted if they are a direct tax on the Tribe. And if the laws are not a tax, the Court must conduct the two-part analysis outlined in *Bracker*: The State regulations are not allowed if they are preempted by federal law (using *Bracker*'s unique preemption standards), or if they infringe on the Tribe's ability to make its own rules and be governed by them. In the latter analysis, the Court must conduct "a particularized inquiry into the nature of the state, federal, and tribal interests at stake" to determine the limit and scope of the State's regulatory authority in Indian country. *Bracker*, 448 U.S. at 145; *see also White Earth Band of Chippewa Indians v. Alexander*, 683 F.2d 1129, 1137-38 (8th Cir. 1982).

### 1. IS IT A TAX?

This Court previously held that the escrow and bond requirements *could be* characterized as a tax on reservation land and reservation Indians, and thus categorically barred. Filing 35 at 14 (citing *Chickasaw Nation*, 515 U.S. at 458). The State argues that the contested regulations are not a tax, and, if the Court

finds that they are a tax, the State asserts that this Court lacks jurisdiction under the Tax Injunction Act, 28 U.S.C. § 1341. Filing 130 at 23, 30. The plaintiffs argue that the escrow requirement is an impermissible direct tax on a tribal business, and the State has no control over the plaintiffs' tobacco business on the Winnebago Reservation or the Omaha Reservation. Filing 124 at 27.

Because contained in the power to tax is the power to destroy, the Supreme Court has categorically barred state taxes levied directly on reservation lands and reservation Indians, and courts need not engage in the *Bracker* balancing act. *See Cnty. of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 258 (1992). The Supreme Court has recognized the tension between states and tribes, and a state's motivation to weaken the power of a tribe. *See McGirt v. Oklahoma*, 140 S.Ct. 2452, 2462 (2020) (states are "neighbors who might be least inclined to respect" tribes). So the Constitution protects tribes from state action which has the power to destroy reservation communities.

A tax can be generally defined as an involuntary exaction which provides for the support of the government. *See* filing 35 at 14 (citing *United States v. La Franca*, 282 U.S. 568, 572 (1931), *Michigan Emp't Sec. Comm'n v. Patt*, 144 N.W.2d 663, 665 (Mich. Ct. App. 1966)). An involuntary exaction which is not a tax is likely a penalty. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 565 (2012). Fundamentally, taxes are intended to raise revenue while penalties intend to control behavior. *See id. at* 567. Yet all taxes, in some way, influence behavior. *Id*. And a penalty will still raise revenue, but is imposed on parties as punishment for an unlawful act or omission. *Id*. So to tell the difference between the two, courts have taken a functional approach and

consider characteristics like the burden on the payor, any scienter requirement, and how the exaction is enforced. *Id.*

The alleged taxes in this case are certain payments tobacco product manufacturers must make while doing business in Nebraska. First, manufacturers must make quarterly deposits into a qualified escrow fund. Neb. Rev. Stat. § 69-2703(2)(a). Second, they must post a bond of at least $100,000 for the benefit of the State, which secures the escrow if the tobacco product manufacturer neglects the obligation to pay the deposit. § 69-2707.01. There is no exaction, and no revenue for the State, unless the State proves the manufacturer committed some wrong related to "(A) the use, sale, distribution, manufacture, development, advertising, marketing, or health effects of, (B) the exposure to, or (C) research, statements, or warnings regarding" tobacco products "manufactured in the ordinary course of business." Master Settlement Agreement part II, cl. nn; Neb. Rev. Stat. §§ 69-2703(2)(b)(i), 69-2702(11). It is not the escrow requirement which raises revenue; rather, the manufacturer's wrongdoing generates funds for the State. The escrow deposits and the bond merely secure the collection of those funds. There is a strong scienter element to the escrow and bond statutes, and a judgment or settlement must be reached before any exaction is made. The escrow requirements more closely resemble a penalty than a tax because so long as the non-participating manufacturer does nothing wrong, the manufacturer may collect interest on the escrow and is entitled to the money after 25 years. From the *Sebelius* factors, it is clear that the escrow and bond requirements are penalties, not taxes.

The plaintiffs' arguments that the regulations are a tax are unconvincing. The plaintiffs even refer to the escrow statutes as a "punitive tax agreement," recognizing the strong scienter element of the escrow and bond

requirements. Filing 124 at 33. This "punitive" nature is a key indicator that the regulations are penalties, not taxes. The plaintiffs argue that the escrow is a tax because the non-participating manufacturers must send forms to the Nebraska Tax Commissioner, and because other states codified the escrow requirements in their tax codes (though Nebraska did not). Filing 124 at 32-33. The enforcement mechanism and the location of a law in a state's code were factors considered by the *Sebelius* court, but, as the plaintiffs themselves explain, courts must take a "'functional approach' rooted in practicality" in determining whether a tax is actually a penalty. Filing 149 at 27-28 (quoting *Sebelius*, 567 U.S. at 566).

The plaintiffs argue that this Court should find the regulations to be taxes if such an interpretation is "fairly possible." Filing 124 at 29 (quoting *Sebelius*, 567 U.S. at 563 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). But that is because federal courts interpret statutes in a way which would preserve constitutionality, for both federal *and* state laws. *Sebelius*, 567 U.S. at 563 (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895) (applying the canon in the context of a state statute)).

For these reasons, the escrow and bond requirements are a penalty, not a tax. This holding is in line with other courts to consider the issue. *King Mountain Tobacco Co., Inc. v. McKenna*, 768 F.3d 989, 996 (9th Cir. 2014); *United States v. Oregon*, 671 F.3d 484, 486, 490-91 (4th Cir. 2012). Therefore, the Court need not address the State's Tax Injunction Act arguments (filing 130 at 29), and the Winnebago Tribe's motion to intervene on condition (filing 164) is denied as moot because the condition is not met. The State's escrow regulations are not categorically barred. Thus, this Court moves on to the two *Bracker* "independent but related" analyses. 448 U.S. at 142.

2. TWO-PRONG *BRACKER* ANALYSES

The lodestar of both *Bracker* analyses is what remains of the Winnebago Tribe's sovereignty. 448 U.S. at 142-43. Native American tribes are imbued with inherent sovereignty, and, through time immemorial, they have reserved elements of nationhood and sovereignty not ceded by treaty or abrogated by federal action. *See*, *e.g.*, *Mescalero Apache Tribe*, 462 U.S. at 332 (quoting *Colville*, 447 U.S. at 153); *Williams*, 358 U.S. at 219-20; *U.S. v. Winans*, 198 U.S. 371, 381 (1905) ("the treaty was not a grant of rights to the Indians, but a grant of right from them, a reservation of those not granted."); *Winters v. U.S.*, 207 U.S. 564, 576-77 (1908); *Worcester v. Georgia*, 31 U.S. 515, 559-60 (1832); Restatement of the Law of American Indians §§ 5 cmt. c, 13; Cohen's Handbook § 4.01; American Indian Law Deskbook § 5:6. Generally speaking, without express federal authorization, a state has no authority over Indians in their own Indian country. *See*, *e.g.*, *Bracker*, 448 U.S. at 142; Restatement of the Law of American Indians §§ 31, 49; Cohen's Handbook §§ 6.01, 6.03 (2012 ed.). The Tribe's sovereignty is most protective over its own members who are on the Winnebago Reservation. "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker*, 448 U.S. at 144.

The State asserts that the plaintiffs have failed to make a prima facie showing that state regulation is unreasonable and unrelated to its regulatory authority, and so *Bracker* balancing is unnecessary. Filing 130 at 46, citing *Alexander*, 683 F.2d at 1138. A tribe has a burden to show a regulation is invalid when seeking to evade state authority over "*non-member activities* within [a] Reservation." *Alexander*, 683 F.2d at 1137. The legal standard is different for state laws applied to enrolled members on their own reservation.

- 14 -

And, a regulation is not a valid exercise of a state's regulatory authority if it infringes on the Tribe's right to make its own laws and be governed by them. To determine whether the regulation makes such an infringement, courts balance the considerations discussed in *Bracker*. *See, e.g., Flandreau Santee Sioux Tribe v. Noem*, 938 F.3d 928, 935 (8th Cir. 2019); *Alexander*, 683 F.2d at 1137.

Answers to questions about a state's authority in Indian country do not depend on "mechanical or absolute conceptions of state or tribal sovereignty." *Bracker*, 448 U.S. at 145. Rather, the Court must conduct a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law" or the Constitution. *Alexander*, 683 F.2d at 1137.

(a) *Bracker* Prong One: Preemption

"The unique historical origins of tribal sovereignty make it generally unhelpful to apply" the same standards of preemption found elsewhere in the law. *Bracker*, 448 U.S. at 143. Instead, tribal sovereignty provides "an important 'backdrop' against which ambiguous federal enactments must always be measured." *Id.* (quoting *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172 (1973)). Usually whether a federal law preempts state action depends on the answers to four questions:

Is the state law explicitly preempted by the federal law? Is the state law implicitly preempted by the federal law because Congress has regulated the entire field? Is the state law implicitly preempted because compliance by a private party with federal and state law is impossible? Is the state law implicitly preempted

- 15 -

> because it creates an obstacle to accomplishment and execution of
> the full purpose of federal law?

*Miller,* 311 F. Supp. 2d at 824 (quoting *Sears, Roebuck and Co. v. O'Brien*, 178 F.3d 962, 966 (8th Cir. 1999)).

The sovereignty "backdrop" is significant. *Alexander*, 683 F.2d at 1138. But Congress has not so regulated the field of tobacco as to expressly preempt state action. Other courts to consider the escrow and bond requirements in the context of Indian sellers of tobacco did not see any conflict, express or implied, with state and federal tobacco regulation in Indian country, and this Court agrees. *See Miller*, 311 F. Supp. 2d at 823; *Colville*, 447 U.S. at 155-56; filing 35 at 11-12.

The plaintiffs argue that the Indian Trader Statutes, 25 U.S.C. §§ 261-264, preempt state regulation of sales made in Indian country.[3] The Indian Trader Statutes require the Commissioner of Indian Affairs to regulate and license who may sell goods to tribal members in Indian country, and they criminalize unlicensed trading. *Cent. Mach. Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 163-66 (1980). The Supreme Court has held that, in some instances, these statutes preempt certain regulations of non-members doing business on a reservation. *Id.*; *Warren Trading Post Co. v. Ariz. State Tax Comm'n*, 380 U.S. 685, 691-92 (1965).

---

[3] The defendants argue that the plaintiffs cannot assert this preemption as a new claim for relief. Filing 144 at 84. But the cases relied on by the State involve a party revising *facts* to either support an additional claim for relief or create an illusory factual dispute. *See Wilson v. Westinghouse Electric Corp.*, 838 F.2d 286, 288-89 (8th Cir. 1998); *Sorenson v. First Wisconsin Nat'l Bank of Milwaukee, N.A.*, 931 F.2d 19, 21 (8th Cir. 1991). In this case, the plaintiffs are not asserting new or contradictory facts in order to avoid summary judgment. Rather, the plaintiffs are making a legal argument clearly allowed by the *Bracker* analysis. Ultimately, the issue is moot, since the Indian Trader Statutes do not preempt the State's regulation.

However, the Eighth Circuit has recently recognized that lately, the Supreme Court has more narrowly construed the Indian Trader Statutes, limiting their preemption effect. *Flandreau Santee Sioux Tribe v. Houdyshell*, 50 F.4th 662, 677 (8th Cir. 2022) (citing *Dep't of Tax'n and Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 71 (1994)). In that case, the issue was whether a state could impose a tax on a non-member contractor working at a casino on a reservation. The Court of Appeals held that the tax was not preempted by the Indian Trader Statutes because there is "no comprehensive and pervasive regulatory scheme governing casino construction projects" in the statutes; the tax was non-discriminatory and applied on all gross receipts of all contractors; there was no evidence that the contractor at issue only performed work for the Tribe; and, importantly, because "the Supreme Court has seemingly moved away from a more rigid application of the Indian Trader Statutes." *Id.* at 677-78; *see also Big Sandy Rancheria Enterprises v. Bonta*, 1 F.4th 710, 727 (9th Cir. 2021).

When the plaintiffs are selling cigarettes on the Omaha Reservation, this is non-member conduct. *Bonta,* 1 F.4th at 729; *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1172 (10th Cir. 2012). But the Indian Trader Statutes cannot be said to preempt state regulation of those sales for the same reasons as in *Houdyshell*: There is no comprehensive and pervasive tobacco sales regulatory scheme, the regulations are non-discriminatory and apply to all sales of tobacco products, and the plaintiffs do business other places than the Omaha Reservation. *See* filing 130 at 14; filing 149 at 16.

A distinction between *Houdyshell* and this case is that, in some circumstances, the Winnebago Tribe is selling cigarettes on its own Reservation. But this type of conduct does not fall under the purview of the Indian Trader Statutes, which generally concern sales by *non-members* to

- 17 -

tribal members on a reservation. 25 U.S.C. § 264; *see also Colville*, 447 U.S. at 155-56. The Indian Trader Statutes cannot be interpreted as prohibiting state regulatory authority over sales by tribal businesses to other tribal members in Indian country because such conduct is not contemplated by the statutes. *See Colville*, 447 U.S. at 155-56. There is no ambiguity here to resolve through the lens of tribal sovereignty under the *Bracker* preemption standard, and the State regulations are not preempted.

### (b) *Bracker* Prong Two: Tribal Sovereignty

Moving to part two of the *Bracker* framework, the plaintiffs' lawsuit will only be successful if it can show that the State's escrow and bond requirements unconstitutionally infringe on the Tribe's right to make its own laws and be governed by them. *Bracker*, 448 U.S. at 142; *Alexander*, 683 F.2d at 1137; *see also Williams*, 358 U.S. at 220. This analysis involves a balancing of various state, federal, and tribal economic and governmental policy interests. *Alexander*, 683 F.2d at 1138. A state has some regulatory authority over non-members in Indian country. *See Noem*, 938 F.3d at 932-33. The limit and extent to this authority is determined by the *Bracker* analysis. *See id.* at 935. "Indians going beyond reservation boundaries have generally been held to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973). But to justify regulations of on-reservation conduct involving only tribal members, the State must demonstrate "exceptional circumstances." *Cabazon*, 480 U.S. at 215 (quoting *Mescalero Apache Tribe*, 462 U.S. at 331-32); American Indian Law Deskbook § 5:20; *see also* Cohen's Handbook § 6.03(b).

*(i) State's Interests*

The State has a strong interest in protecting the public health by regulating tobacco sales. The laws at issue require escrow deposits in the event a tobacco product manufacturer causes harm to the public, such as exposing Nebraskans to health risks. The bond requirement secures the escrow, and the escrow secures any potential future monetary judgment. These laws ensure that the State can enforce a judgment against manufacturers which may otherwise be judgment-proof. *See Miller*, 311 F. Supp. 2d at 826. And, contractually, the State must diligently enforce these laws, or else it risks losing substantial payments as part of the MSA. The MSA settlement payments fund various health, education, and other state programs. Filing 145 at 68-69. So the State has two important interests in enforcing the escrow and bond requirements against the plaintiffs – securing any potential judgment against tobacco product manufacturers which cause harm to public health, and fulfilling the State's contractual obligations to secure settlement payments to fund essential state programs. The State has an interest in protecting both Indian and non-Indian potential victims of misbehaving tobacco product manufacturers. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2502 (2022).

The plaintiffs characterize the State's interest as a "generalized interest in raising revenue." Filing 124 at 43 (quoting *Noem*, 938 F.3d at 935, 937). However, as explained above, the escrow laws are not concerned with raising revenue. Instead, the State's interest is in protecting the public health and securing a judgment in the event that a manufacturer causes harm to the public. Protecting public health and safety has been regularly validated as a strong governmental interest. *See, e.g., Flandreau Santee Sioux Tribe v. Terwilliger*, 496 F. Supp. 3d 1307, 1331 (D.S.D. 2020); *Brown & Williamson*

*Tobacco Corp. v. Pataki*, 320 F.3d 200, 217 (2d Cir. 2003); *Ward v. New York*, 291 F. Supp. 2d 188, 204 (W.D.N.Y. 2003).

The State's interest in protecting the public health provides justification for its enforcement of the laws against nonmembers, and this interest might create "exceptional circumstances" allowing State regulatory authority over the on-reservation activities of a tribal business. *Mescalero Apache Tribe*, 462 U.S. at 331-32; *see Cabazon*, 480 U.S. at 215. The State's contractual obligation to enforce its escrow laws, however, is a less substantial interest, and is decidedly unexceptional. The State's obligation does not tip the scale one way or another with respect to whether the State has the authority to enforce its laws in Indian country.

### (ii) Federal Interests

The federal government has repeatedly demonstrated, and courts have consistently recognized, a firm commitment to policies which protect tribal sovereignty and encourage tribal businesses and self-sufficiency. *See* Uniform Standards for Tribal Consultation, 87 Fed. Reg. 74479 (Nov. 30, 2022) ("The United States recognizes the right of Tribal governments to self-govern and supports Tribal sovereignty and self-determination."); National Native American Heritage Month, 2020, 85 Fed. Reg. 70425 (Oct. 30, 2020) ("This comprehensive plan protects Tribal sovereignty and economic self-determination"); *Colville*, 447 U.S. at 155; *Mescalero Apache Tribe*, 462 U.S. at 334-35; *Cabazon*, 480 U.S. at 217; Restatement of the Law of American Indians § 4 cmt. d. This commitment arises out of the trust relationship between the federal government and Native tribes. *See* Cohen's Handbook § 5.04(3). But this federal interest does not go "so far as to grant tribal enterprises. . . an artificial competitive advantage over all other businesses in a State." *Miller*, 311 F.Supp.2d at 823 (citing *Colville,* 447 U.S. at 155).

- 20 -

The federal interests here are less commanding than in *Cabazon*, 480 U.S. 202, or *Mescalero Apache Tribe*, 462 U.S. 324. In those cases, the federal government had implemented policies specific to the areas sought to be regulated by the states, casinos and wildlife management. Here, the federal government has not indicated, through acts of Congress, rules of the Bureau of Indian Affairs, or any other administrative effort, any intention to either encourage or discourage tribal tobacco product manufacturing. But the federal government is *aware* that some tribal businesses are engaging in tobacco product manufacturing, and no action has been taken to disallow this activity or allow state regulation. *See, e.g.,* 21 U.S.C. 387t(c); U.S. Food and Drug Administration Center for Tobacco Products, *Manufacturers on Tribal Lands,* https://bit.ly/41SWKtK (Nov. 5, 2020). The plaintiffs comply with various federal laws governing tobacco labeling, licensing, and reporting. Filing 130 at 50-51.

On-reservation businesses run by tribal entities are entitled to some level of federal protection from state interference. *McGirt*, 140 S. Ct. at 2476 ("The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)); *Bracker*, 448 U.S. at 143-45; Restatement of the Law of American Indians § 4 cmt. d; Cohen's Handbook § 5.04(2)(b); *cf. Miller*, 311 F.Supp.2d at 824 ("the federal interest in encouraging Indian tribal economic self-sufficiency and tribal self-determination *alone* is insufficient to preempt state jurisdiction to regulate *off-reservation* tribal commerce" (emphasis added)). In the face of federal silence, the federal interests weigh in favor of preventing state interference with tribal businesses.

*(iii) Tribal Interests*

The Tribe's interests can be framed a few different ways. Narrowly construed, the Tribe's interest is in selling cigarettes, a product known to cause health problems, to raise revenue for the Tribe. But the tribal interests run deeper and implicate inherent attributes of sovereignty not yet ceded by treaty or abrogated by federal action. See *Mescalero Apache Tribe*, 462 U.S. at 332; *Winans*, 198 U.S. at 381. The State acknowledges that "[t]ribal interests include the right of a tribal member to purchase cigarettes excise tax free while within the boundaries of the Indian country governed by the tribe of which they are a member." Filing 145 at 67. The right of a tribal company to *sell* cigarettes free of state regulation within the boundaries of its own Indian country is analogous, at least in terms of assessing the interests of the Tribe.

The Tribe taxes and regulates tobacco product sales on the Winnebago Reservation, and has entered into the Universal Tobacco Settlement Agreement, which mirrors the MSA. *See* filing 124 at 6. The Tribe, as much as the State, has an interest in protecting the public health of its members on the Winnebago Reservation, and has an interest in securing a monetary judgment against the plaintiffs if they cause a harm to the Tribe. The Tribe, not the State, carries the burden of protecting its members who may be harmed by products manufactured by a tribal business. So, the Tribe has a legitimate interest in regulating tobacco sales on the Winnebago Reservation in a way which will protect its members' public health and safety, much like the State.

Additionally, the Tribe has an economic interest in the plaintiffs' businesses. While the Tribe does not have a valid interest in maintaining an artificial competitive advantage, *Moe*, 425 U.S. at 482, the Tribe and the federal government both have a strong policy incentive to promote tribal businesses and tribal economic development. *See Cabazon*, 480 U.S. at 218-19.

- 22 -

In determining the tribal interests at stake, the *Cabazon* court considered that tribal games were "the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservation." *Id*. Here, the plaintiffs are not the sole source of income for the Tribe, because they are subsidiaries of a much larger parent company which engages in a wide variety of markets to create revenue for the Tribe. And, the plaintiffs are not a "major source" of employment, as only nine tribal members have been employed by Rock River since 2014.[4] Filing 130 at 4; filing 149 at 3. The Tribe's interests here are not as strong as in *Cabazon*, but there is still an economic interest which weighs in the plaintiffs' favor.

The State argues that the only interest the Tribe has in evading the escrow laws is in the competitive advantage the Tribe would have by selling tobacco products without having to account for escrow deposits. Filing 130 at 57. But the tribal interests here, while weaker than *Cabazon*, are stronger than those in *Colville*. A tribe does not have in interest in marketing an "exemption from state taxation." *Colville*, 447 U.S. at 155; *see also Noem*, 938 F.3d at 933. But the plaintiffs are selling tobacco products which have been manufactured on the Winnebago Reservation, and they are "not merely importing a product onto the reservation[] for immediate resale to non-Indians." *Cabazon*, 480 U.S. at 219. Both the cigarettes which Rock River imports from other manufacturers and ones manufactured on the Winnebago Reservation are distinguishable from the products in *Colville*. Again, the plaintiffs are not "*merely* importing . . . for *immediate resale*," *Cabazon,* 480 U.S. at 219, because

---

[4] The plaintiffs assert that they have been forced to "downsize their personnel dramatically" since 2018 following an ATF raid and the State's attempted enforcement of the escrow requirements. Filing 149 at 3. However, even prior to these concerns, the plaintiffs appear to have been minimally staffed by Winnebago members since 2014. *See* filing 131-18.

- 23 -

when Rock River imports cigarettes, it still stamps them pursuant to state and federal law, and it sells them to HCID to be distributed to Pony Express stores for resale. This economic system creates value for the Tribe and for the consumers.

The Tribe has created a sophisticated vertically integrated business which capitalizes on all stages of the tobacco product market, from manufacturing to distribution to retail sale. The tribal business has sold imported cigarettes in the past, but these are purchased by Rock River and sold to HCID to be distributed to retailers, so it is less analogous to a retailer which imports a product onto a reservation "for immediate resale." *Cabazon,* 480 U.S. at 219. The value of the plaintiffs' sales to customers on the Reservation comes from the tobacco products manufactured by the plaintiffs, and from their well-structured businesses which allow the Tribe to profit from all aspects of the tobacco product market, and not from any marketed exemption from state regulations.

### (iv) Balancing

Both sales on the Omaha Reservation and the Winnebago Reservation are subject to *Bracker* balance: For sales on the Omaha Reservation, the conduct is on-reservation by a non-member, and sales on the Winnebago Reservation are on-reservation activities of a tribal business. These distinctions significantly change the balancing analysis.

### a. Omaha Reservation

The plaintiffs' activities on the Omaha Reservation constitute non-member conduct on a reservation. *See Pruitt,* 669 F.3d at 1172 (tribal members acting outside their own Indian country, "including within the Indian country of another tribe," are subject to state regulation); *Bonta,* 1 F.4th at 729. On

balance, the *Bracker* factors allow State regulation of such conduct. The plaintiffs' tribal affiliation provides the plaintiffs little protection once they are doing business outside the boundaries of the Winnebago Reservation. *See Pruitt,* 669 F.3d at 1172; *Colville,* 447 U.S. at 161. The State's interests outweigh the federal and tribal interests for the sales on the Omaha Reservation.

The Omaha Reservation is within the territory of the State.[5] *Hicks,* 533 U.S. at 361-62. And non-Indians and non-member Indians are expected to comply with nondiscriminatory state laws in Indian country. *See Alexander,* 683 F.2d at 1138; *Moe,* 425 U.S. at 482; *Colville,* 447 U.S. at 160; *Pruitt,* 669 F.3d at 1172. The Omaha Tribe's sovereignty is the one implicated by the State's regulation for sales on the Omaha Reservation. *See Colville,* 447 U.S. at 161. The Winnebago Tribe does not have the same interests for activities which take place off the Winnebago Reservation. The escrow and bond requirements have been upheld by other courts for sales in Indian country made by a non-member tobacco product manufacturer. *Miller,* 311 F.Supp.2d at 826; *Pruitt,* 669 F.3d at 1182-83; *see also Pryor,* 425 F.3d at 174.

For these reasons, as they pertain to sales on the Omaha Reservation, the plaintiffs' motion for summary judgment is denied and the defendants' motion is granted. The plaintiffs must comply with the State's escrow and bond requirements while selling tobacco products on the Omaha Reservation.

---

[5] The plaintiffs argue that their treaty rights and the Kansas-Nebraska Act of 1854 prevent State action in all Indian territory. See filing 124 at 70-71. While the Kansas-Nebraska Act did not confer State jurisdiction in Indian country, subsequent laws, such as Pub. L. 280, 67 Stat. 588, as amended, 18 U.S.C. § 1162, 28 U.S.C. § 1360, did so. Congress has broad authority to modify the powers of tribes and the boundaries of reservations, and has done so here. Restatement of the Law of American Indians § 14; *see Michigan v. Bay Mills Indian Cmty.,* 572 U.S. 782, 790 (2014).

b. Winnebago Reservation

(1) On-Reservation Conduct by a Tribal Business

As a preliminary matter, the Court must determine whether the State is regulating non-member conduct or member conduct, and whether the conduct sought to be regulated takes place on the Winnebago Reservation. *See Bracker*, 448 U.S. at 144; *Pruitt,* 669 F.3d at 1171 (citing *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005)). Only in "exceptional circumstances" may a state "assert jurisdiction over the on-reservation activities of tribal members." *Cabazon*, 480 U.S. at 215 (quoting *Mescalero Apache Tribe*, 462 U.S. at 331–32). This is because a tribe's sovereignty is most protective over its own members on its own reservation, "the federal interest in encouraging tribal self-government is at its strongest," and a state's interest in regulating such activities is "minimal." *Bracker*, 448 U.S. at 144.

The contested laws concern the sale of cigarettes from a tobacco product manufacturer to a consumer or to an intermediary, like a distributor or retailer. Neb. Rev. Stat. § 69-2703. Before lawfully selling cigarettes in Nebraska, tobacco product manufacturers must be listed in the State's directory. *See* § 69-2706(4). A tobacco product manufacturer includes any entity that manufactures cigarettes intended to be sold in the United States. § 69-2702(13). Tobacco product manufacturers who do not participate in the MSA must certify compliance with the escrow statute, § 69-2703, and must post a bond, § 69-2707.01, in order to be placed on the directory. § 69-2706.

In Nebraska, cigarette taxes are levied on the consumer, but are pre-paid by tobacco companies. *See* § 77-2602; Nebraska Dep't of Revenue, Information for Cigarette and Tobacco Products Retailers, https://bit.ly/3L5Pe7U (accessed Apr. 27, 2023). A stamping agent for the tobacco company, certified by the Nebraska Tax Commissioner, pays the per-cigarette tax and receives a stamp

to affix to a pack of cigarettes. The stamps can only be placed on brands listed in the directory, which means the stamp certifies compliance with both the cigarette tax, § 77-2602, and with the escrow deposit and bond requirements, § 69-2703. *See* § 69-2706(1)(d).

The escrow and bond requirements operate separately from the cigarette tax. *Compare* § 77-2602 *with* § 69-2703; *see also* filing 145 at 53 ("Despite the complimentary [sic] nature of the tax and escrow regulatory mechanisms, they remain legally distinct."). And unlike the cigarette tax, the escrow deposits and bond are imposed on the manufacturer. § 69-7203. This is also true for settlement payments from participating manufacturers—these are not related to the cigarette tax, and instead these payments are made in exchange for a release of claims relating to health and advertising liability which would arise from *selling* cigarettes, rather than *buying* them. Both the escrow requirements and the participating manufacturer settlement payments are related to potential wrongdoing of manufacturers, while the cigarette tax is imposed on those buying what the manufacturers are selling. *See Moe*, 425 U.S. at 482. The State's argument that the regulations are "minimal burdens" incident to the valid collection of the cigarette tax is without merit because the escrow laws are not intended to prevent fraud or tax evasion like the regulations in *Moe* or *Colville*. Filing 130 at 49; *Moe*, 425 U.S. at 483; *Colville*, 447 U.S. at 159.

The escrow and bond requirements *only impact* the sellers of tobacco products, *not* the purchasers. These requirements *directly* regulate a tribal business. *Cf. Pruitt*, 669 F.3d at 1180. The purchaser is indirectly impacted by the subsequent increase in price. The identity and tribal affiliation of purchasers matters in the context of the cigarette tax because it is the "vendee, user, consumer, or possessor of cigarettes" who is obliged to pay. Neb. Rev.

Stat. § 77-2602.01. Of course, the cigarette tax is prepaid by tobacco companies, *see id*., but the reason that states may impose "minimal burdens" on tribal business is because tribes are not subject to the regulation itself, and may only be required to assist in enforcement. In this context, the tribal affiliation, or lack thereof, of the purchasers is irrelevant. *Compare Pruitt,* 669 F.3d at 1180 (escrow laws "do not directly regulate" the tribe) *and Houdyshell,* 50 F.4th at 671 (a non-preempted tax was "not aimed at regulating tribal gaming"), *with Cabazon,* 480 U.S. at 214 ("the state and county laws at issue here are imposed directly on the Tribes that operate the games").

From this, it is clear that the subject of the State's regulations is Rock River, a tribally chartered tobacco product manufacturing company. The tobacco product manufacturer, *and no one else*, is responsible for making the escrow deposits and for posting a bond. Because the escrow and bond requirements only apply to sellers of cigarettes, the tribal affiliation or lack thereof of purchasers is irrelevant.

Having established that the State's regulations constitute a direct regulation on a tribal entity, the next question is whether the conduct takes place on-reservation or off. The State argues that the plaintiffs' conduct is off-reservation, relying on *King Mountain Tobacco Co. v. McKenna,* 768 F.3d at 998. Filing 130 at 54-55. According to the State, because Rock River purchases tobacco from places outside the Winnebago Reservation, sells cigarettes to retailers outside the Winnebago Reservation, and most of Rock River's products are ultimately purchased by non-members outside of the Winnebago Reservation, the plaintiffs' activities are off-reservation and thus these activities are subject to otherwise applicable state laws.

Relying on *Jones,* 411 U.S. 145, the *King Mountain* court reasoned that because the tribal tobacco product manufacturer sent tobacco to other places

off the reservation to be processed and mixed with non-reservation tobacco, the company's "tobacco related activities" were "largely off reservation" and thus subject to generally applicable state regulation. The district court determined that because the tobacco products produced by the tribal company were "not principally generated from the use of reservation land and resources" and "not directly derived from trust land" that the business's activities were "off-reservation." *King Mountain Tobacco Co. v. McKenna*, No. 11-cv-3018, 2013 WL 1403342, at *8. The State urges the same result here.

But this Court is neither bound by, nor persuaded by, the Ninth Circuit's interpretation of *Jones*. In *Jones*, the tribe was operating a ski resort located *wholly off* reservation land. 411 U.S. at 146. The entire business was off the reservation, not parts of the business. *Id.* There is no support for the Ninth Circuit's extension of *Jones* to hold that a tribal business must generate its products principally from reservation land and resources. *Jones* does not provide a "test" to apply in order to determine whether a tribal member's business is on reservation or off; it simply stands for the unremarkable principle that "Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *McKenna*, 2013 WL 1403342 at *7 (quoting *Jones*, 411 U.S. at 148-49). However, this general principle must be read alongside the principle that state law is generally inapplicable to on-reservation conduct involving tribal members. *Bracker*, 448 U.S. at 144.

Additionally, the *King Mountain* holding is inconsistent with *Cabazon*. Compare *King Mountain*, 768 F.3d at 994, *with Cabazon*, 480 U.S. at 205-06, 214-16. In *Cabazon*, a state could not impose restrictions or regulations on a tribal-run bingo operation. While that Court did not make any findings to this effect, certainly there were aspects of the bingo operation which required "off-

reservation" resources. And the revenue generated by the bingo operation primarily came from non-members coming onto the reservation to participate in the bingo, not from reservation resources. *See Cabazon*, 480 U.S. at 205-06, 214-16. While the federal preemption arguments were stronger in that case than here or in *McKenna* because the federal government actively promoted tribal bingo enterprises, *id.* at 217-18, the Court assumed that because the bingo operation was on the reservation, operating the bingo establishment was on-reservation conduct, and no "test" about such conduct was necessary. *Compare id., with McKenna,* 2013 WL 1403342 at *7-8, *and King Mountain,* 768 F.3d at 994; *see also Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430, 435 (9th Cir. 1994) ("It is not necessary. . . that the entire value of the on-reservation activity come from within the reservation's borders.").

The conduct at issue in this case is the *sale* of tobacco products by a tobacco product manufacturer or importer (*see* Neb. Rev. Stat. § 69-2702(13)(a)) to Nebraska consumers – not the purchase or acquisition of raw materials, and not even the actual manufacturing process or the importation of tobacco products. A tribal business selling cigarettes on a reservation is on-reservation conduct, even if non-members are coming onto the reservation to purchase cigarettes or if off-reservation resources are needed to create the product being sold. *Cf. Cabazon,* 480 U.S. at 220-21.

### (2) Exceptional Circumstances

The sale of cigarettes by the plaintiffs on the Winnebago Reservation constitute "on-reservation conduct involving only Indians." *Bracker,* 448 U.S. at 144. The State must demonstrate "exceptional circumstances" in order to impose its regulations on the plaintiffs. *Mescalero Apache Tribe,* 462 U.S. at 331-32; *Cabazon,* 480 U.S. at 215; *see also Puyallup Tribe, Inc. v. Dep't of Game of State of Wash.,* 433 U.S. 165, 175 (1977); *Hicks,* 533 U.S. at 353, 361-62;

- 30 -

Restatement of the Law of American Indians §§ 31(a)(2), 31 cmt. c, 49; American Indian Law Deskbook § 5:20. Exceptional circumstances "are likely to be found only when the involved state regulation serves as an important adjunct to independently valid regulation of nonmember activity, where specific statutory or treaty provisions apply, or where very significant state interests are immediately implicated." American Indian Law Deskbook § 5:20; Mescalero Apache Tribe, 462 U.S. at 331-32 n.15 (citing Puyallup Tribe, 433 U.S. at 175); see also Hicks, 533 U.S. at 362.

"A tribe's power to prescribe the conduct of tribal members has never been doubted," and state actions which infringe on that power necessarily infringe on tribal sovereignty. Mescalero Apache Tribe, 462 U.S. at 332; see also Restatement of the Law of American Indians § 49. Certainly Nebraska residents will come to the Winnebago Reservation to purchase tobacco products, and may experience the known adverse health effects, but Nebraska allows products with the same health effects to be purchased elsewhere in the state, and residents may also travel to other states to purchase them. These are not the types of "off-reservation" effects contemplated in Mescalero Apache Tribe. 462 U.S. at 336. The off-reservation effects of the plaintiffs' sales of cigarettes to non-members help demonstrate the State's interest, but an asserted authority over sales of a legal product, in compliance with federal standards for health and safety, is hardly an "exceptional circumstance."

While the federal and tribal interests are less weighty than those in Cabazon or Mescalero Apache Tribe for reasons discussed above, and while the State interests are compelling, the burden the State seeks to impose tips the weight of the balancing test toward the plaintiffs. The regulations are not taxes; they are punitive exactions, meant to compensate the State for potential future violations of State laws. But no harm has yet occurred. Indeed, the

State's interest in enforcing these escrow laws is less about the satisfaction of a potential judgment and more about creating price parity between the tribal tobacco product manufacturers and the tobacco product manufacturers who are signatories to the MSA. *See Miller*, 311 F.Supp.2d at 818 (the escrow laws were passed in response to the settling manufacturers' concerns about non-settling manufacturers' "lower costs and commercial freedom"); *Pryor*, 425 F.3d at 163. The State's interest in the continued MSA payments from participating manufacturers cannot justify the regulation. The State is obliged to "diligently enforce" the escrow laws. But this does not grant the State the power to regulate areas outside its jurisdiction.

The State characterizes the escrow and bond requirements as having an "indirect effect on tribal members in Indian country." Filing 130 at 57 (quoting *Pruitt*, 669 F.3d at 1182). But the plaintiffs would incur a substantial burden in complying with the escrow laws. This is, actually, the point. The State must require these laws or else the market share of the manufacturers who participate in the MSA is in jeopardy, contrary to the promises in the MSA. *See Pryor*, 425 F.3d. at 163; *Miller*, 311 F.Supp.2d at 818. And, it is unclear, in negotiating an "agreement" with the Tribe under Neb. Rev. Stat. §§ 69-2703(2)(b)(iv) and 77-2602.06, what other burdens the State might seek to impose on tribal businesses. The burden of the escrow is not incidental—it is direct, and intentional. It is intended to burden tobacco product manufacturers to reduce any market advantage obtained by not participating in the MSA. Further, the *Moe* "minimal burden" analysis is an *exception* to the general rule that a state has no power over on-reservation tribal businesses, even those which provide goods or services to non-members. Cohen's Handbook § 6.03(1)(b); American Indian Law Deskbook § 5:20; *see also, e.g., Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 981-83 (10th Cir. 2005).

This case, similar to *Cabazon*, "involves a state burden on tribal Indians in the context of their dealings with non-Indians" because the question is whether the State may impose its escrow and bond requirements on tribal businesses selling tobacco products to both members and non-members. 480 U.S. at 216. The State asserts that *Cabazon*, because it was superseded by statute, does not reflect the standard to be applied to this case. Filing 145 at 78. The State argues that the Supreme Court has not applied the *Cabazon* analysis in the context of cigarette taxation, so this Court should not rely on the analysis. But this case is unique in that it is a tribal business operating on a reservation which is burdened by State's attempted regulation. *Cabazon* lays out the appropriate standard for when state authority is allowed in Indian country over tribal entities. 480 U.S. at 219-20. Congress has not acted to enable state regulation of tobacco product manufacturing in Indian country, and until it does so, *Cabazon* demonstrates the importance of protecting tribes from state action which would infringe on the tribe's right to make its own laws and be governed by them.

In other cases, states were able to impose certain burdens on tribal businesses for on-reservation conduct of *non-members*. *Moe*, 425 U.S. at 482-83; *Colville*, 447 U.S. at 151; *see also Alexander*, 683 F.2d at 1138; Neb. Rev. Stat. § 77-2602.01. But that justification does not exist here because it is only the tobacco product manufacturer's obligation to pay the escrow. *Compare* Neb. Rev. Stat. § 77-2602.01 ("The impact of [the cigarette excise tax] is hereby declared to be on the vendee, user, consumer, or possessor of cigarettes in this state") *with* § 69-2703 ("Any tobacco product manufacturer selling cigarettes to consumers within the state, whether directly or through a distributor, retailer, or similar intermediary or intermediaries. . . shall . . . [p]lace into a qualified escrow account. . . $.0188482 per unit sold.").

The State further argues, based on *Pruitt* and *Rice v. Rehner*, 463 U.S. 713, 720 (1983), that "invalidation of a state law because it interferes with tribal sovereignty is not favored." Filing 130 at 56 (quoting *Pruitt*, 669 F.3d at 1171). This is generally true for state regulation of non-members in Indian country, but *not* the case for on-reservation conduct by a tribal business. *Rice* represents one of very few situations where a tribal business was required to adhere to state civil regulations. *See* American Indian Law Deskbook § 5:20 n.6. But this decision rested on such historically pervasive federal regulation involving alcohol in Indian country that Congress had "divested the Indians of any inherent power to regulate in this area," giving the states such authority. *Rice*, 463 U.S. at 724, 733; American Indian Law Deskbook § 5:20 n.6. No comparable federal regulation exists for tobacco product manufacturing, or tobacco use generally, in Indian country. Congress cannot be said to have divested tribes of the power to regulate tobacco product manufacturing as is the case with liquor sales. *See* Restatement of the Law of American Indians § 14 cmt. b.

To summarize, the distinguishing facts of this case, which show a lack of "exceptional circumstances" justifying state authority, are:

- The regulations at issue constitute a direct burden on a tribal business operating on a reservation, *cf., e.g.,* *Pruitt*, 669 F.3d at 1180,
- The regulations are not incident to the collection of a valid tax imposed on non-members, *cf. Moe*, 425 U.S. at 483,
- The plaintiffs are providing more than an exemption to state taxation to customers, *Cabazon*, 480 U.S. at 219; *cf. Colville*, 447 U.S. at 155,

- The federal government has neither implicitly nor explicitly authorized state regulation of tribal tobacco businesses, *cf. Rice*, 463 U.S. at 733,

- The federal government has neither prohibited nor limited tribal tobacco businesses to such a degree as to divest the Tribe's inherent power to regulate in this area, *cf. id.* at 724,

- The regulation involves an exaction which, while not a tax, constitutes a non-minimal burden on tribal commerce because the State is attempting to pre-enforce any potential judgment against a tribal business operating on its own reservation, *cf. Moe*, 425 U.S. at 483

- The tribal conduct is not criminal and is in compliance with relevant federal health and safety laws, *cf. Hicks*, 533 U.S. at 364,

- The Tribe's treaty does not abrogate its ability to regulate tribal businesses, *cf. Puyallup Tribe,* 433 U.S. at 175, *and Mescalero Apache Tribe,* 462 U.S. at 342, and

- The purported "off-reservation effects" are insufficient to justify State intrusion into the affairs of on-reservation tribal businesses, *Mescalero Apache Tribe*, 462 U.S. at 342.

In the face of Congress's silence and without exceptional circumstances, this Court will not allow the State to infringe on the Winnebago Tribe's sovereignty by allowing state authority over a lawful tribal business selling goods *on its own reservation. See McGirt*, 140 S.Ct. at 2459, 2462-63; *Bay Mills,* 572 U.S. at 790; Restatement of the Law of American Indians §§ 31(c), 46(e), 49.

(c) Other Matters

For the purposes of this Order, some of the parties' contentions are moot or irrelevant. To the extent the parties dispute the factual boundaries of the Omaha and Winnebago Reservation, that matter would be better taken up in an enforcement action by the State. *See* filing 170 at 2. The State insists that the plaintiffs provided insufficient documentation "for establishing the factual boundaries of the Omaha or Winnebago Reservations." Filing 170 at 2. The factual borders of the reservations do not impact the legal analysis in this Order.

Because the Court did not rely on filing 125-3, the declaration of Victoria Kitcheyan, Chairwoman of the Tribal Council of the Winnebago Tribe, the State's motion to strike (filing 154) is denied as moot.[6]

IT IS ORDERED:

1.     The plaintiffs' motion for summary judgment (filing 123) is granted in part and denied in part.

2.     The defendants' motion for summary judgment (filing 129) is granted in part and denied in part.

3.     The defendants and their successors are permanently enjoined from enforcing the escrow and bond payment

---

[6] The State's motion was only directed at the affidavit of Victoria Kitcheyan, and not the underlying documents attached. So, the Court properly assessed the information attached in the underlying documents, which included relevant sections of the Winnebago Tribal Code, the Universal Tobacco Settlement Agreement, a 2018 Economic Impact Study done by Ho-Chunk which provided general information about Ho-Chunk and its subsidiaries, and Ho-Chunk's Annual Report for shareholders. *See generally* filing 125-3.

requirements for sales by the plaintiffs on the Winnebago Reservation.

4.     The Winnebago Tribe of Nebraska's motion to intervene on condition (filing 164) and the defendants' motion for a hearing (filing 169) are denied as moot.

5.     The defendants' motion to strike (filing 154) is denied as moot.

6.     The Clerk of the Court is directed to substitute Mike Hilgers, Nebraska Attorney General, and Glen A. White, Interim Nebraska Tax Commissioner, as the defendants pursuant to Fed. R. Civ. P. 25(d)(1).

7.     This case is closed.

8.     A separate judgment will be entered.

Dated this 27th day of April, 2023.

BY THE COURT:

_____

John M. Gerrard
Senior United States District Judge

- 37 -